**IN THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS**
3rd DIVISION DIVISION

JULIE RAINWATER, individually and on
behalf of all others similarly situated,

                 Plaintiff,

   -against-

KEURIG GREEN MOUNTAIN, INC.

                 Defendant.

FILED

2015 AUG 21 PM 4 12

RHONDA WHARTON, CLERK

**CLASS ACTION COMPLAINT**

Case No. 23CV-15-818

**JURY TRIAL DEMANDED**

      Plaintiff, Julie Rainwater, on her own behalf and on behalf of all others similarly situated,

brings this action against Defendant, Keurig Green Mountain, Inc. ("Keurig" and/or "Defendant").

## I.     PARTIES

### A.   Plaintiff

    1.    Plaintiff, Julie Rainwater ("Rainwater") is a resident of the State or Arkansas, County

of Faulkner.  During the Class Period (defined below), in Arkansas, Rainwater indirectly purchased at

least one Keurig K-Cup that was manufactured or licensed by Keurig or its affiliates, for her own use

and not for resale.  As a direct and proximate result of Keurig's anticompetitive conduct, Rainwater

paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain

injury when purchasing Keurig K-Cups.  Rainwater still owns a Keurig Single-Serve Brewer and does

purchase and will continue to purchase Keurig K-Cups in Arkansas.

### B.   Defendant

    2.    Defendant, Keurig Green Mountain, Inc. is a corporation organized under the laws of

the State of Delaware with its principal place of business and headquarters located at 33 Coffee

Lane, Waterbury, Vermont.  Until March 6, 2014, Keurig was known as Green Mountain Coffee

Roasters, Inc. ("GMCR"), which was headquartered in Waterbury, Vermont.  Keurig is also the

successor to Keurig, Inc., which, prior to its merger with GMCR on December 31, 2013, was a



wholly owned subsidiary of GMCR organized under the laws of the State of Delaware with its principal place of business in Reading, Massachusetts. On March 10, 2014, GMCR announced that it had changed its name to Keurig Green Mountain, Inc., referred to herein as "Keurig."

**C.**      **Agents and Co-Conspirators**

3.      Various persons and entities other than Keurig have conspired in the violations alleged herein and have performed acts and made statements in furtherance of its unlawful scheme designed to maintain, expand, and abuse Keurig's market power and monopoly in the relevant markets that include Arkansas. These other persons and entities have facilitated, participated in, and aided and abetted the conspiracy. The co-conspirators committed overt acts and communicated with others in the conspiracy to restrain, restrict, exclude and foreclose competition in the State of Arkansas. These co-conspirators include Roaster Competitors who have participated in Keurig's scheme to control, restrain and exclude competition in the Keurig Compatible Cup Market by participating in and effectuating a group boycott of Cup Competitors.

**II.      JURISDICTION AND VENUE**

4.      This Court has jurisdiction pursuant to Ark. Const., Amend. 80, § 6, and A.C.A. § 16-13-201(a). This Court also has jurisdiction pursuant to Rule 23 of the Arkansas Rules of Civil Procedure.

5.      This Court has personal jurisdiction over Defendant, Keurig, pursuant to A.C.A. § 16-4-101. At all times material to this action, Defendant was conducting business in the State of Arkansas. The Plaintiff purchased products sold and manufactured by the Defendant in the State of Arkansas and part of the transactions which give rise to this action took place in Faulkner County, Arkansas.

6.      Venue is proper in this judicial district pursuant to A.C.A. § 16-55-213, *et al,* on the grounds that Defendant's misconduct occurred, in part, in Faulkner County.

7.     The named Plaintiff and the Class Members assert no federal question. The state law causes of action asserted herein are not federally pre-empted.

8.     The named Plaintiff and the Class Members assert that the aggregate amount in controversy will not exceed the sum or value of $2,500,000.00.   The aggregate amount in controversy of the Class Members' claims does not and will not exceed $2,500,000.00, excluding interest. No Class Member has a claim which exceeds $1,000.00, including compensatory damages, restitution and attorneys' fees.

## III.   FACTUAL ALLEGATIONS

9.     Keurig has engaged in anticompetitive conduct that has harmed, and continues to harm, consumers who make hot beverages using single-serve brewers manufactured and sold by Keurig.

10.     Keurig's anticompetitive conduct ranges from conspiring with its major horizontal competitors in the coffee roasting business, engaging in extensive contracts in restraint of trade throughout the supply chain, tying sales of its single-serve brewers to sales of its single-serve cups, and monopolization.

11.     By entering into an extensive web of anticompetitive written agreements with co-conspirators and participants throughout the supply chain, Keurig has gained control over every aspect of the Keurig Compatible Cup Market (as defined below), enabling Keurig to exclude competition from this market.

12.     Keurig's anticompetitive conduct has harmed competition in the Keurig Compatible Cup Market and has hurt consumers by forcing them to pay supracompetitive prices for Keurig K-Cups (as defined below), depriving them of access to high-quality, less-expensive, alternative products, and greatly limiting consumer choice.

13.     Single-serve brewers ("Single-Serve Brewers") are machines used to brew a variety

of hot beverages, such as coffee and tea, in single-serving portions.  Keurig dominates and controls at least 89% of the market for the manufacture, distribution, and sale of all Single-Serve Brewers in the United States with its Keurig Single-Serve Brewers.

14.     The only type of portion packs that will work in the Keurig Single-Serve Brewer is referred to as the "Keurig Compatible Cup(s)."  Keurig Compatible Cups that are made or licensed by Keurig are referred to as "Keurig K-Cup(s)."

15.     Keurig presently dominates and controls at least 86% of the United States market for the manufacture, distribution and sale of Keurig Compatible Cups with its Keurig K-Cups.  The remaining 14% of the market for Keurig Compatible Cups consists of "Cup Competitors," meaning persons or entities (other than Keurig, its licensees or customers) that make, distribute or sell Keurig Compatible Cups.  These portion packs made, distributed or sold by Cup Competitors for use in Keurig Single-Serve Brewers are referred to herein as "Competitive Cups."  There are very few Cup Competitors, none of which also compete with Keurig for the sale of Single-Serve Brewers.

16.     Competitive Cups can cost as much as 58% less than the Keurig K-Cups, contain high-quality coffee, and other features that consumers may prefer.  They cannot obtain meaningful market share due to the insurmountable cumulative illegal barriers to entry erected by Keurig.  The fact that Keurig is able to maintain its market share and supracompetitive prices in the face of lower-priced and high-quality alternatives exemplifies Keurig's market power and the effectiveness of its scheme to exclude competition from the Keurig Compatible Cup Market.

17.     Through its Green Mountain Coffee Roasters division (Keurig's original sole line of business), Keurig is and has been in the coffee-roasting and coffee-processing business, which involves, among other things, the purchase, roasting, and processing of coffee beans and other raw materials for packaging and sale of Keurig K-Cups to distributors, wholesalers, retailers and consumers.

18.    In order to reduce and restrain competition in the business of roasting and supplying coffee for Keurig Compatible Cups, Keurig has systematically acquired in recent years many of its major coffee-roaster competitors, including, among others, Tully's Coffee Corporation, Timothy's Coffees of the World, Inc., Diedrich Coffee, Inc. and LNH Holdings, Inc. (Van Houtte).

19.    In order to control and further reduce the threat of competition in the business of roasting and supplying coffee and other hot-beverage products for Keurig Compatible Cups, Keurig has negotiated multi-year exclusionary horizontal licensing and manufacturing agreements with most of the major coffee-roaster and hot-beverage competitors ("Roaster Competitors") that it was not able to acquire ("Roaster Agreements"). These Roaster Competitors include, among others, the following:    Starbucks Corporation ("Starbucks"), The Folgers Coffee Company ("Folgers"), International Coffee & Tea, LLC d/b/a The Coffee Bean & Tea Leaf ("Coffee Bean"), Millstone Coffee, Inc. ("Millstone"), Dunkin Brands, Inc. ("Dunkin' Donuts"), Cinnabon, Inc. ("Cinnabon"), Wolfgang Puck Coffee ("Wolfgang Puck"), Newman's Own Organics ("Newman's Own"), The Hain Celestial Group "Celestial Seasonings"), Twinings North America, Inc. ("Twinings"), and Bigelow Tea ("Bigelow"). These horizontal agreements prohibit Keurig's Roaster Competitors from doing business with Cup Competitors.

20.    Either through acquisition or through restrictive horizontal Roaster Agreements, Keurig controls substantially all of the major coffee brands, foreclosing Cup Competitors' access to those brands.

21.    Pursuant to Keurig's agreements with its Roaster Competitors, the parties agree not to do business with any of Keurig's Cup Competitors in a number of ways.    First, the Roaster Agreements prevent anyone but Keurig from using Roaster Competitors' coffee (or other hot beverage products) or brand names in connection with Keurig Compatible Cups; in this way, these agreements serve as exclusive supply arrangements.    Second, these agreements prevent anyone but

Keurig from accessing the Roaster Competitors' own distribution networks. The purpose of the Roaster Agreements is to exclude and restrain competition and maintain supracompetitive Keurig K-Cup prices for the common benefit of Keurig and the Roaster Competitors.

22.    Keurig enters into exclusive supply arrangements with manufacturers of equipment, and suppliers of components, needed to produce traditionally designed Keurig Compatible Cups. The purpose of such agreements is to prevent actual or potential Cup Competitors from accessing the machinery and components generally needed to enter the Keurig Compatible Cup Market, preventing or delaying potential Cup Competitors from entering and effectively competing in the Keurig Compatible Cup Market. Although it may be possible to design a Competitive Cup that does not rely on such machinery or inputs, doing so requires additional investments of time and money, delaying potential Cup Competitors from entering and effectively competing in the Keurig Compatible Cup Market.

23.    In addition to relying on third-party distributors and retailers, Keurig also has its own distribution and retail network that it uses to sell its own branded products as well as those of others. Keurig has entered into exclusive agreements with most of its horizontal distributor competitors ("Distributor(s)") that restrict, restrain and reduce competition in the Keurig Compatible Cup Market. Keurig conditions the sale of Single-Serve Brewers on the Distributor's agreement to buy, distribute and sell Keurig K-Cups as well as the agreement not to purchase or sell Competitive Cups. These agreements prohibit Keurig's Distributors from doing business with Cup Competitors. The purpose of these agreements is to restrict, restrain and reduce competition in the Keurig Compatible Cup Market, which in turn enable Keurig to maintain supracompetitive Keurig K-Cup prices.

24.    Keurig has also entered into restrictive agreements with its horizontal competitors at the retail level. Keurig makes direct sales to consumers of Keurig Single-Serve Brewers and Keurig K-Cups through its online retail store available at http://www.keurig.com/Keurig-Store. Keurig has

exclusionary agreements with many of the major retailers that sell Keurig Single-Serve Brewers and Keurig Compatible Cups ("Retailer(s)"). In some of these agreements, Keurig conditions the sale of Single-Serve Brewers on the Retailer's agreement to buy, distribute and sell Keurig K-Cups as well as the agreement not to purchase or sell Competitive Cups. The purpose of these agreements is to restrict, restrain and reduce competition and maintain supracompetitive Keurig K-Cup prices.

25.     Keurig has acquired, controlled, dominated, monopolized and restrained the Keurig Compatible Cup Market, causing harm to consumers, through the following anticompetitive acts, among others:

(a)     By entering into exclusive supply arrangements with manufacturers of equipment, and suppliers of components, needed to produce traditionally designed Keurig Compatible Cups to deter or foreclose potential Cup Competitors from entering and effectively competing in the Keurig Compatible Cup Market;

(b)     By entering into multi-year exclusive agreements with Roaster Competitors to lock up substantially all of their coffee (including tea, cocoa and other hot-beverage products) for use in Keurig Compatible Cups and preventing them from doing business with Cup Competitors, collectively constituting a concerted refusal to deal with Cup Conspirators;

(c)     By entering into multi-year, exclusive dealing agreements with Distributors and Retailers who agreed not to do business or to severely limit the volume or scope of business they do with Cup Competitors; and

(d)     By using its market power in the Single-Serve Brewer Market to coerce purchasers of Keurig Single-Serve Brewers to purchase only Keurig K-Cups, or at least not purchase Competitive Cups.

26.     Keurig's anticompetitive conduct resulted in direct purchasers being overcharged for Keurig K-Cups, and such overcharges were passed on by direct purchasers to Plaintiff and the members of the Class.

27.     This anticompetitive conduct has harmed, and continues to harm, consumers by forcing them to pay supracompetitive prices for Keurig K-Cups, depriving them access to high-quality and less-expensive alternative products, restricting output, and limiting consumer choice.

28.     Absent redress, consumers will continue to be harmed.

29.     Plaintiff and members of the Class, defined below, purchased for their own use and not for resale, at least one Keurig K-Cup that was manufactured or licensed by Keurig or its affiliates. This class action seeks to stop Keurig from continuing to monopolize, restrict, restrain, foreclose and exclude competition, and to compensate Plaintiff and the members of the Class of consumers who have been harmed by the anticompetitive and unlawful activities of Keurig.

A.    **Relevant Markets**

30.     There are two relevant markets: (1) the market for the manufacture, distribution and sale of Single-Serve Brewers ("Single-Serve Brewer Market"); and (2) the market for the manufacture, distribution and sale of Keurig Compatible Cups ("Keurig Compatible Cup Market").

31.     The geographic market affected by Keurig's illegal activities includes the State of Arkansas.

32.     The Single-Serve Brewer Market is a relevant product market impacted by the unlawful conducted alleged herein.

33.     Single-Serve Brewers are a speedy, convenient and tidy way for consumers to brew single servings of hot beverage such as coffee, tea or other beverages. Because the Single-Serve Brewers have such unique attributes, the price of traditional drip coffee makers does not significantly constrain prices for Single-Serve Brewers. Consumers are willing to pay a premium for Single-Serve Brewers above the price of traditional drop coffee makers.

34.     Keurig manufactures, distributes and sells a number of different Single-Serve Brewers under the brand name "Keurig" - - including Keurig K-Cup Brewers, Vue Brewers and Rivo Brewers. The price of Keurig Single-Serve Brewers ranges from $89.95 to $249.95.

35.     Keurig Single-Serve Brewers use portion packs that are not physically compatible with other types of Single-Serve Brewers. Similarly, Single-Serve Breweres manufactured by

Keurig's brewer competitors use portion packs that are not physically compatible with Keurig Single-Serve Brewers.

36.    The vast installed base of Keurig's Single-Serve Brewers also serves as a significant barrier to entry.  Keurig benefits from a significant first-to-market advantage in the Single-Serve Brewer Market.

37.    Keurig has sold more than 35 million Keurig Single-Serve Brewers and over 20 billion Keurig K-Cups.  The ubiquity of Keurig Compatible Cups combined with the limited availability and selection of portion packs for other Single-Serve Brewers creates a formidable obstacle to marketing a Single-Serve Brewer that cannot use Keurig Compatible Cups.

38.    Even if such barriers could be overcome, Keurig has erected additional barriers to entry through its Roaster Agreements with horizontal Roaster Competitors, which ensure that substantially all of the major Roaster Competitors cannot do business with potential new entrants into the Single-Serve Brewer Market.

39.    Barriers to entry in the Single-Serve Brewer Market have proven effective; Non-Keurig Single-Serve Brewers hold less than 11% of the Single-Serve Brewer Market.

40.    The Keurig Compatible Cup Market is a relevant product market impacted by the unlawful conduct alleged in this Class Action Complaint.

41.    Keurig's own Keurig Compatible Cup, referred to herein as the Keurig K-Cup(s), is a specific portion pack for use in Keurig Single-Serve Brewers.  Keurig extracts supracompetitive prices from consumers on sales of Keurig K-Cups.

42.    Keurig's ability to increase the price of its Keurig K-Cups above competitive levels is not constrained by portion packs used with non-Keurig Single-Serve Brewers because those portion packs do not work in Keurig Single-Serve Brewers, and the few brewers which use portion packs that are not compatible with Keurig Single-Serve Brewers have little market share compared to

Keurig Single-Serve Brewers.

43.     Keurig Compatible Cups are visually and physically distinct from portion packs for other Single-Serve Brewers. Keurig Compatible Cups are only physically compatible with Keurig Single-Serve Brewers. Likewise, portion packs made to work in other Single-Serve Brewers are not physically compatible with Keurig Single-Serve Brewers.

44.     Keurig Compatible Cups and other portion packs are not reasonable interchangeable. Comers are locked into using only portion packs designed to work with their specific and unique Single-Serve Brewer.

45.     Once a consumer purchases a Keurig Single-Serve Brewer, the consumer is locked into purchasing Keurig Compatible Cups. Other portion packs will not work with Keurig Single-Serve Brewers.

46.     Current consumers of Keurig Compatible Cups would face significant switching costs if they wanted to brew beverages using portion packs other than Keurig Compatible Cups because they would have to purchase a different type of single-serve brewer. As a result, a small but significant non-transitory increase in the price of Keurig Compatible Cups would not substantially raise demand for portion packs other than Keurig Compatible Cups.

47.     Portion packs other than Keurig Compatible Cups do not constrain the price for Keurig Compatible Cups.

48.     Also, Keurig's ability to increase the price of Keurig K-Cups above competitive levels has not been reasonably constrained by the price of ground coffee. Due to enhanced convenience and simplicity, consumers are willing to pay a substantial premium for coffee that can be brewed in Single-Serve Brewers.

49.     The relevant geographic market includes Arkansas. Keurig is able to increase the price of Keurig's Single-Serve Brewers and Keurig K-Cups in Arkansas (1) without large numbers

of consumers quickly turning to alternative suppliers; and (2) without manufacturers supplying consumers with a substitute supply.

**B.    GMCR Acquired Control Over Keurig K-Cup Technology**

50.    In the 1990s, one of Keurig's predecessor entities, Keurig, Inc., developed Keurig Single-Serve Brewers and Keurig K-Cups and obtained patents for some of the technology used in those brewers and for some of the technology associated with the Keurig K-Cups.

51.    Keurig, Inc. licensed that technology to various coffee roasting companies, including GMCR, for the manufacture and sale of coffee in Keurig K-Cups.

52.    In 2002, Keurig introduced its Keurig Single-Serve Brewer for home use.

53.    GMCR became a public company headquartered in Vermont in 1993.

54.    In order to combine its coffee roasting business with the Single-Serve Brewer business of Keurig, Inc., GMCR bought 42% of the then small business for $15 million in 2002, and acquired the remaining 58% of Keurig, Inc. in 2006 for $104 million. In early 2014, Keurig, Inc. changed its name to Keurig Green Mountain, Inc., which is referred to herein as "Keurig."

55.    Since its acquisition of Keurig, Inc., Keurig systematically made further acquisitions and acquired greater control over the Single-Serve Brewer Market and the Keurig Compatible Cup Market, eventually enjoying an 89% market share in the Single-Serve Brewer Market and an 86% share in the Keurig Compatible Cup Market.

56.    After GMCR acquired a substantial interest in Keurig, Inc., Keurig began acquiring Roaster Competitors and entered into exclusive Roaster Agreements with other Roaster Competitors.

57.    In 2009, Keurig acquired Tully's Coffee Corporation and Timothy's Coffees of the World, Inc.

58.    In 2010, Keurig acquired Diedrich Coffee, Inc. and LNH Holdings, Inc. (Van Houtte).

## C.    Keurig Patent

59.    Keurig had two patents that purportedly protected certain aspects of Keurig's brewer technology and technology related to certain types of filtered Keurig K-Cups.  These patents were set to expire in 2012.

60.    Prior to the expiration of its patents, Keurig brought two patent infringement lawsuits against two Cup Competitors, TreeHouse Foods, Inc.'s ("TreeHouse") subsidiary, Strum Foods, Inc. ("Sturm") and The Rogers Family Co. ("Rogers Family"), after they began competing against Keurig in the Keurig Compatible Cup Market.

61.    The lawsuits against Strum and Rogers Family were dismissed and both dismissals were affirmed by the Federal Circuit.   In both cases, the Federal Circuit deemed Keurig's lawsuit an impermissible attempt to end-run the limitations of its patents and harm competition.  The Federal Courts expressly found *"Keurig is attempting to impermissibly restrict purchasers of Keurig [Single-Serve Brewers] from using [Competitive Cups] by invoking patent law"* and admonished Keurig for *"attempting to institute a postsale restriction that prevents non-Keurig cartridges from being used in Keurig Brewers."*

## D.    Lock-Out Technology That Will Prevent Competitive Cups From Working In Keurig Single-Serve Brewers

62.    Anticipating competition from Cup Competitors in the Keurig Compatible Cup Market, Keurig announced on November 20, 2013, a plan to exclude all competition in the Keurig Compatible Cup Market - - the Keurig 2.0 Brewer.  The Keurig 2.0 Brewer will technologically bar Competitive Cups from working in the Keurig 2.0 Brewers.

63.    The Keurig 2.0 Brewer was expected to be released in the autumn of 2014 with the expectation of replacing all Keuring Single-Serve Brewers on the market within one or two years. Keurig used the November 20, 2013 announcement to further exclude competition with Keurig products.

64.     The Keurig 2.0 Brewer contains a sensor to read a special tag embedded on the foil lids of each Keurig K-Cup, enabling Keurig to prevent the Keurig 2.0 Brewer from working if a Competitive Cup is placed in the Keurig 2.0 Brewer.

65.     Keurig created the Keurig 2.0 Brewer lock-out technology in order to force all Cup Competitors out of business or be forced to enter into licensing agreements with Keurig.

66.     In addition to the other barriers to entry alleged herein, the Keurig 2.0 Brewer constitutes an additional barrier to entry into the Keurig Compatible Cup Market.

67.     There is no procompetitive benefit to consumers from the Keurig 2.0 Brewer's lock-out technology that would outweigh the anticompetitive effects that Keurig's scheme will have in the Keurig Compatible Cup Market.   While Keurig claims to have added new unrelated innovative features to the Keurig 2.0 Brewer, these features do not depend upon the lock-out technology for their functionality.

### E.     <u>Exclusionary Agreements to Block Cup Competitors</u>

68.     To foreclose potential Cup Competitors from manufacturing, distributing and selling Competitive Cups, Keurig signed exclusive agreements with suppliers of the machinery and components typically used to make Competitive Cups. These arrangements were anticompetitive, as they were intended to restrain and exclude competition in the Keurig Compatible Cup Market.

69.     There were only two companies that made machinery for producing traditionally designed Keurig Compatible Cups.  Both were under exclusive supply contracts with Keurig that prohibited these companies from selling machinery to Cup Competitors who intended to use that machinery to make Keurig Compatible Cups.

70.     TreeHouse, one of only a few Cup Competitors, attempted to purchase a Spee-Dee Holmatic machine from R.A. Jones & Co. ("R.A. Jones") to manufacture non-filtered Competitive Cups (non-filtered because this would not infringe Keurig's then-effective patents).  According to

TreeHouse, in response to its request, a Sales Manager for R.A. Jones wrote: "I am quite embarrassed to be writing this email, but it needs to be done. R.A. Jones is declining to quote the new machine for soluble, non-filtered product." Under "the rules," R.A. Jones agreed with Keurig that "if the cup goes into a Keurig brewer, [R.A. Jones] cannot quote it." But, R.A. Jones could still "build equipment for all types of packages, just not [Keurig] K-Cups or anything that goes into a Keurig brewer."

71.     TreeHouse was unable to find another supplier in the United States willing to sell it machinery used to make non-filtered Competitive Cups.

72.     Because R.A. Jones was free to supply the same equipment for purposes other than making Competitive Cups, the restriction placed on supplying equipment for the purpose of making Competitive Cups cannot be justified on the basis that it ensures a reliable supply of equipment for Keurig.

73.     The Keurig exclusive supply agreements with machine manufacturers restricted the ability of TreeHouse and other Cup Competitors to buy machinery needed to make traditionally designed Keurig Compatible Cups for competition in the Keurig Compatible Cup Market. Keurig's restrictive practices raised Cup Competitors' costs, delayed or precluded their entry into the market and greatly reduced their ability to meaningfully compete against Keurig.  There were no procompetitive justifications for Keurig's exclusive agreements with machine suppliers.

74.     Keurig similarly restrained competition and foreclosed Cup Competitors' access to the components used to make traditionally designed Keurig Compatible Cups. Because components must be custom-engineered for use in Keurig Single Serve Brewers, there are very few suppliers of these components.

75.     Keurig entered into exclusive supply agreements with suppliers of Keurig Compatible Cup components, which according to TreeHouse, forced it to work with less experienced suppliers at

14

a higher cost to TreeHouse.

76.    Before TreeHouse attempted to enter the Keurig Compatible Cup Market, there were three main domestic suppliers of the plastic cups used in Keurig K-Cups:  Winpak Ltd. ("Winpak"), Phoenix Cups, and Curwood, which at the time, collectively accounted for all or nearly all of the market for the sale of components used to manufacture Keurig K-Cups.

77.    TreeHouse approached all three companies (Winpack, Phoenix Cups and Curwood), none of which would agree to provide plastic cups to TreeHouse for the purpose of manufacturing Competitive Cups.

78.    Any restriction prohibiting these plastic cup suppliers from selling plastic cups to TreeHouse cannot be justified on the purported basis that an exclusive agreement was necessary to ensure a reliable supply of plastic cups for Keurig because all three companies were free to supply cups for use in products not intended for use in Keurig Single-Serve Brewers.

79.    The Keurig exclusive supply agreements with component suppliers restricted the ability of TreeHouse and other Cup Competitors to buy components needed to manufacture traditionally designed Keurig Compatible Cups to meaningfully compete with Keurig in the Keurig Compatible Cup Market.  Keurig's restrictive practices raised Cup Competitors' costs, delayed or outright precluded their entry into the market, and greatly reduced their ability to meaningfully compete against Keurig.  There were no procompetitive justifications for Keurig's exclusive agreements with component suppliers.

80.    Keurig has acquired a number of roasters.  The bulk of Keurig's remaining Roaster Competitors, who are in the same coffee-roasting and coffee-processing business, have agreed with Keurig to stay out of the Keurig Compatible Cup Market, except with regard to certain licensing or manufacturing agreements they have with Keurig.

81.    As part of their agreements with Keurig, Roaster Competitors agree not to do business

with Keurig's Cup Competitors. These exclusive supply agreements and concerted refusals to deal restrain competition by preventing Cup Competitors from: (i) having access to Roaster Competitors' coffee and other products for sale in Keurig Compatible Cups; (ii) having access to Roaster Competitors' brands to mark or market Competitive Cups; (iii) being able to enter into manufacturing agreements with Roaster Competitors for the manufacture of Keurig Compatible Cups on behalf of Roaster Competitors; and (iv) being able to access the Roaster Competitors' distribution and retail networks for the distribution and sale of Competitive Cups. These agreements create insurmountable barriers to entry for potential and actual Cup Competitors, preventing them from being able to meaningfully compete against Keurig.

82.    Keurig sought and secured from its Roaster Competitors long-term contractual agreements that foreclosed the Roaster Competitors from dealing with Keurig's rivals in the Keurig Compatible Cup Market.

83.    The Keurig agreement with Roaster Competitor Caribou Coffee Company, Inc. ("Caribou") provides "that Caribou *shall not directly, or through any Person* in which Caribou directly or indirectly owns an equity interest...*sell coffee, Tea or Other Hot Beverage Products to any third party for the specific intended use of producing Keurig portion packs or any other product intended for use in the Keurig Brewing System*" and "*Caribou shall not directly or indirectly...design, develop or manufacture, or contribute in any way thereto, any single-cup portion pack products, including any brewer designed for use with single-cup portion pack cartridges other than the Keurig Brewer....*" Keurig has entered into similar agreements with substantially all of its major Roaster Competitors.

84.    In February 2010, Keurig signed a multi-year Roaster Agreement with J.M Smucker Company ("Smucker"), a leader in the retail coffee business, under which Keurig is the exclusive manufacturer of Keurig K-Cups under Smucker's Folgers and Millstone brands. Smucker sells the licensed Keurig K-Cups in grocery stores, mass merchandise stores, drugstores, wholesale clubs and

on Smucker's website. Smucker is precluded from doing business with Cup Competitors.

85.     In February 2011, Dunkin' Donuts, a market leader in the United States coffee business, entered into a Roaster Agreement with Keurig under which Keurig is the exclusive manufacturer of Dunkin' Donuts Keurig K-Cups. The parties agreed that Dunkin' Donuts Keurig K-Cups would be sold exclusively at Dunkin' Donuts restaurants. The parties also agreed that some Dunkin' Donuts restaurants would sell Keurig Single-Serve Brewers. Dunkin' Donuts is precluded from doing business with Cup Competitors.

86.     In March 2011, Starbucks signed a multi-year Roaster Agreement to have Keurig manufacture, market, distribute and sell Starbucks-branded Keurig K-Cups. This was an important step in Keurig's plan to solidify its long-term control of the relevant markets, because Starbucks is the world's largest coffee retailer.   Starbucks is precluded from doing business with Cup Competitors.

87.     The Starbucks-Keurig deal also allows Keurig to manufacture and sell Keurig K-Cups for Starbucks' other brand, including Seattle's Best.

88.     In May 2013, Coffee Bean signed a multi-year Roaster Agreement with Keurig. Coffee Bean is the largest privately held specialty coffee and tea retailer in the United States. This Roaster Agreement gives Keurig the right to sell Coffee Bean Keurig K-Cups through multiple distribution paths beginning in the spring of 2014. Coffee Bean is precluded from doing business with Cup Competitors.

89.     In July 2013, Cinnabon signed a multi-year Roaster Agreement with Keurig allowing Keurig to manufacture and sell Cinnabon Keurig K-Cups through a variety of distribution channels. Cinnabon is precluded from doing business with Cup Competitors.

90.     In August 2014, Kraft Foods Group, Inc. ("Kraft") signed a multi-year Roaster Agreement with Keurig allowing Keurig to manufacture and sell Kraft Keurig K-Cups by way of

Kraft's brands, which include: Maxwell House, Gevalia, Yuban and McCafe'. Kraft is one of North America's largest consumer packaged food and beverage companies. Kraft is precluded from doing business with Cup Competitors.

91.     Keurig has also locked up other major brands' coffee, tea, cocoa and other hot beverages through anticompetitive Roaster Agreements with companies such as Wolfgang Puck, Gloria Jean's Gourmet Coffees Corp., Newman's Own, Celestial Seasonings, Twinings, Bigelow and others.   Each of these Roaster Competitors is precluded from doing business with Cup Competitors.

92.     As part of these agreements, if the Roaster Competitor wants its products to be packaged in Keurig Compatible Cups packaged in Keurig Compatible Cups for use in Keurig Single-Serve Brewers.  The Roaster Competitor must agree to buy Single-Serve Brewers and Keurig Compatible Cups only from Keurig.

93.     The Roaster Competitors must agree not to sell their coffee or other products to Cup Competitors for sale in Competitive Cups and agree not to license their brand names to Cup Competitors.

94.     The Roaster Competitor must also agree not to purchase, distribute or sell Competitive Cups.

95.     Roaster Competitors that wish to buy, distribute or sell Keurig Single-Serve Brewers through their own distribution networks must agree to purchase Keurig K-Cups from Keurig and, at the very least, must agree not to purchase Competitive Cups.

96.     These agreements between Keurig and its Roaster Competitors constitute, among other things, unlawful exclusive supply agreements and an unlawful concerted refusal to deal with Cup Competitors.

F.    **Distribution and Retail Channels**

97.    Keurig utilizes its market power with Distributors and Retailers to restrict or prevent them from doing business with Cup Competitors by threatening to terminate access to Keurig Single-Serve Brewers and Keurig K-Cups.

98.    Keurig's unlawful agreements with Distributors and Retailers, along with the other anticompetitive conduct alleged herein, substantially restrain and foreclose competition in the relevant markets.

99.    Keurig's ability to enter into anticompetitive agreements with Distributors and Retailers is enhanced by Keurig's anticompetitive agreements with substantially all of the major Roaster Competitors.

100.    If a Distributor or Retailer wants access to Keurig K-Cups containing major Roaster Competitors' popular products, they must do business with Keurig.

101.    Distributors' and Retailers customers demand access to the major brands of Roaster Competitors' popular products controlled by Keurig.

102.    Due to the installed base of Keurig Single-Serve Brewers, many Distributors and Retailers have no choice but to comply with Keurig's demands.

103.    Keurig has roughly 500 agreements with Distributors, of which only a small number of Distributors control the bulk of sales.  These agreements are generally referred to as Keurig Authorized Distributor ("KAD") agreements.

104.    Under KAD agreements, Distributors distribute Single-Serve Brewers and Keurig K-Cups for commercial, non-residential purposes to workplace/office, travel/hospitality and food-service consumers.

105.    Distributors who enter into KAD agreements include office-supply distributors and food-service management companies.  These particular Distributors distribute the majority of Keurig

K-Cups.

106.   Distributors enter into multi-year KAD agreements that include exclusive provisions prohibiting the Distributors from promoting, marketing, selling or making available any Competitive Cups to their customers.

107.   Some or all of Keurig's KAD agreements contain provides that provide: "*Distributors shall not directly, indirectly or through an affiliate promote, market, sell or otherwise make available (a) any beverage base or portion pack product, other than Keurig Packs, that can be used in a Keurig Brewer.*"

108.   If a Distributor wants to purchase and distribute Keurig Single-Serve Brewers, it must agree to purchase Keurig Compatible Cups from Keurig only and must agree not to do business with Cup Competitors, including agreeing not to purchase of distribute Competitive Cups.

109.   These agreements between Keurig and Distributors constitute (i) unlawful exclusive dealing agreements; and (ii) unlawful tying agreements.  In addition, these agreements further and strengthen Keurig's and the Roaster Competitors' unlawful concerted refusal to deal with Cup Competitors.

110.   Keurig firmly enforces these unlawful agreements.  On or about March 26, 2012, Keurig warned its KADs that they are subject to termination by Keurig if they market or sell Competitive Cups.

111.   Keurig has consistently continued to enforce its exclusionary agreements.  As recently as February 28, 2014, one of Keurig's Senior Sales and Customer Relations Managers, David Smagala, threatened Fox Vending, Inc. ("Fox"), a KAD that was considering distributing Competitive Cups.  Fox's President was informed in writing by Keurig that if it wanted to renew its distributorship with Keurig, Fox would have to agree to an even stricter contract containing "a pretty detailed loyalty clause that would need to be adhered to as well.  Meaning our KAD's could only sell

Keurig[] K-Cups *no rouge [sic-rogue] packs could be sold or other brewers sold other than Keurig.*"

112.    According to Fox, its relationship with Keurig was terminated, meaning it could no longer supply customers with Keurig K-Cups and related supplies, including replacement Keurig Single-Serve Brewers, precluding Fox from being able to adequately meet the demands of its customers.

113.    Such exclusionary conduct keeps Cup Competitors from using these Distributors to distribute and market Competitive Cups.  In early 2012, Rogers Family met with some of the largest Distributors, but Rogers Family was told by each of the Distributors that they would do business with Rogers Family because of the Distributors' exclusive agreements with Keurig.  As one Distributor wrote:  "It was very nice meeting with you and learning about [Rogers Family]. Unfortunately *we cannot distribute any other form of [Keurig Compatible Cup] according to our contract with Keurig/Green Mountain.*"

114.    Keurig's actions with Distributors and Retailers enforce its exclusive dealing and tying agreements, which simultaneously support and reinforce Keurig's agreements with Roaster Competitors to boycott Cup Competitors.

115.    According to one Distributors sworn declaration:    "Keurig uses these KAD agreements to cement its dominant market position…by forcing vendors to supply only licensed Keurig products, thereby locking customers into the [Keurig] K-Cup ecosystem.  Distributors must sign a KAD agreement that includes a 'loyalty agreement' that *requires the KAD to only sell Keurig-branded or authorized single-serve coffee brewers and compatible portion packs.*"

116.    Retailers have informed Rogers Family of the exclusive provisions in the Retailers' agreements with Keurig and have stated that Keurig has threatened to terminate access to Keurig K-Cup Branded portion packs if the Retailer purchases any Competitive Cups.

117.    According to Rogers Family's sworn statements, although Staples found the coffee to be of good quality, "due to [Staples's] contractual agreements with [Keurig]," Staples is "locked in tight" and cannot sell Competitive Cups.

118.    Keurig obscures the fact that customers of such Retailers, who sign Keurig's restrictive agreements, are being deprived of the ability to choose Competitive Cups by creating the illusion of choice.  Keurig accomplishes this illusion by marketing its Keurig K-Cups through a variety of well-known major brands, which consumers do not necessarily associate with Keurig, such as Starbucks, Dunkin' Donuts, Caribou, Folgers, Newman's Own, Maxwell House, Gevalia and McCafe'.

119.    Because a variety of brands – al controlled by Keurig through its restrictive agreements – are available at Retailers, such as Staples, consumer would not realize that they had no choice but to buy Keurig K-Cups at the point of sale if they purchase a Keurig Single-Serve Brewer and Keurig Compatible Cups at the same Retailer.

120.    Keurig uses its market power in the Single-Serve Brewer Market to coerce Distributors and Retailers, as well as other purchasers of Single-Serve Brewers, to purchase only Keurig Compatible Cups manufactured by Keurig, or at least to not purchase and sell Competitive Cups.

121.    Keurig enjoys at least an 89% market share in the Single-Serve Brewer market, has a massive installed base of those brewers and controls the majority of major coffee brands who sell products for use in such brewers.

122.    Distributors and Retailers who purchase Keurig Single-Serve Brewers for resale have to be able to purchase and provide their customers with Keurig Compatible Cups for those brewers. But the restrictive language in their contracts with Keurig requires that they provide their customers with only Keurig K-Cups; they are restricted from purchasing and providing Competitive Cups to

their customers.

123.    By the anticompetitive conduct alleged herein, including entering into extensive anticompetitive written agreements with horizontal competitors (the Roaster Competitors), as well as with other participants throughout the supply chain, Keurig has gained control over every aspect of the Keurig Compatible Cup Market, enabling Keurig to exclude competition from this market.

124.    Because Keurig has restrained and excluded competition from Cup Competitors, there has been reduced output, less innovation, reduced consumer choice and higher prices in the Keurig Compatible Cup Market than there would have been in a competition in a competitive market.

125.    Keurig's anticompetitive conduct has harmed competition in the Keurig Compatible Market and has caused significant harm to consumers by reducing output, limiting consumer choice (*i.e.* depriving consumers of the opportunity to choose from high-quality, less-expensive and environmentally substantial alternative Competitive Cups) and forcing them to pay supracompetitive prices for Keurig K-Cups.

## IV.    CLASS ALLEGATIONS

126.    Plaintiff brings this class action pursuant to the Arkansas Rules of Civil Procedure 23, on her own behalf and as representative of the Arkansas Class of Indirect-Purchasers ("Class") as defined below with respect to claims arising at an time between July ___, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases (the "Class Period").

127.    The following "Arkansas Class" is sought to be certified under the laws of Arkansas:

> All persons and entities in Arkansas that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint ventures for their own use and not for resale, at any time between July ___, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases.

Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors and parties to any supply, retail or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Single-Serve Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities and any judge or jurors assigned to this case.

128.   This action can be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

129.   <u>Numerosity</u>:  Based upon Defendant's publicly available sales data with respect to the products at issue, it is estimated that the Class numbers in the hundreds, and that joinder of all Class members is impracticable.

130.   <u>Common Questions Predominate</u>:  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class Members.  The questions of law and fact common to the Class include, but are not limited to:

a.   Whether the Single-Serve Brewer Market is a relevant product market;

b.   Whether the Keurig Compatible Cup Market is a relevant product market;

c.   Whether Arkansas constitutes a relevant geographic market for the Single-Serve Brewer Market and the Keurig Compatible Cup Market;

d.   Whether Keurig possesses market or monopoly power in the Single-Serve Brewer Market;

e.   Whether Keurig possesses market or monopoly power in the Keurig Compatible Cup Market;

f.   Whether Keurig and its alleged horizontal competitors (Roaster Competitors) agreed or combined to restrain competition and exclude competitors from the Keurig Compatible Cup Market;

g.   Whether Keurig entered into concerted refusals to deal in order to foreclose competition and exclude Cup Competitors from the Keurig Compatible Cup Market;

h.   Whether Keurig used its market power in the Single-Serve Brewer Market to coerce purchasers who buy Single-Serve Brewers to purchase Keurig K-Cups, or at least not to purchase Competitive Cups;

i.      Whether Keurig combined or conspired to fix, raise, maintain or stabilize the price of Keurig K-Cups or otherwise restrain trade in the United States;

j.      Whether Keurig violated the Arkansas Deceptive Trade Practices Act;

k.      Whether Keurig was unjustly enriched by its unlawful actions;

l.      Whether the conduct of Keurig caused injury to the business or property of Plaintiff and the Members of the Class;

m.      The effect of Keurig's conduct on the prices of Keurig K-Cups sold in Arkansas during the Class Period; and

n.      The appropriate class-wide measure of damages.

131.    Typicality:  Plaintiff's claims are typical of the claims of the members of each Class because Plaintiff bought Defendant's products during the Class Period.  Defendant's unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced.  Plaintiff and each Class sustained similar injuries arising out of Defendant's conduct in violation of Arkansas law.  The injuries of each member of each Class were caused directly by Defendant's wrongful conduct.   In addition, the factual underpinning of Defendant's misconduct is common to all Class members of each class and represents a common thread of misconduct resulting in injury to all members of each Class.  Plaintiff' claims arise from the same practices and course of conduct that give rise to the claims of each member of the Class and are based on the same legal theories.

132.    Adequacy:  Plaintiff will fairly and adequately protect the interests of the Class. Neither Plaintiff nor Plaintiff's counsel have any interests that conflict with or are antagonistic to the interests of the Class.  Plaintiff has retained competent and experienced class action attorneys to represent their interests and those of the members of the Class.  Plaintiff and Plaintiff's counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the members of the class and will diligently discharge those duties by seeking the maximum possible recovery for the Class.

133.   <u>Superiority</u>: There is no plain, speedy or adequate remedy other than by maintenance of this class action.  The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of each Class member's rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.  Further, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.  Class treatment of common questions of law and fact would also be superior to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the Court and the litigants, and will promote consistency and efficiency of adjudication.

134.   <u>Predominance</u>:  The prerequisites to maintaining a class action pursuant to ARK. R. CIV. P. 23 are met as questions of law or fact common to each class member predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

135.   Plaintiff and Plaintiff's counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## V.      CAUSES OF ACTION

### FIRST CAUSE OF ACTION
(Violation of A.C.A. § 4-88-101 et seq.)

136.   Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

137.   Defendant's   conduct   constitutes   unlawful   deceptive   and   unconscionable   trade

practices. Defendant's manufacturing, distribution and sale of Defendant's products were unlawful, in violation of A.C.A. § 4-88-101, et seq.

138.  Defendant unlawfully sold Defendant's products in Arkansas during the Class Period.

139.  Defendant engaged in, and continues to engage in, unlawful deceptive and unconscionable trade practices.

140.  Defendant's unlawful actions were likely to deceive reasonable consumers.

141.  Plaintiff and other members of the Class who purchased Defendant's Keurig K-Cups and/or the Keurig Single-Serve Brewer in Arkansas were deceived.

142.  Plaintiff and other members of the Class were injured by Defendant's unlawful deceptive and unconscionable trade practices.

143.  Defendant's deception caused Plaintiff and other members of the Class to purchase Defendant's products that they would otherwise not have purchased had Plaintiff known the true nature of these products.

144.  Plaintiff and other members of the Class were injured as a result of Defendant's unlawful deceptive and unconscionable trade practices.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment)

145.  Plaintiff repeats and realleges each of the above allegations as if fully set forth herein.

146.  As a result of Defendant's unlawful and deceptive actions described above, Defendant was enriched at the expense of Plaintiff and the Class through the payment of the purchase price for the Keurig K-Cups and/or Keurig Single-Serve Brewers.

147.  Under the circumstances, it would be against equity and good conscience to permit Defendant to retain the ill-gotten benefits that they received from the Plaintiff and the Class, in light of the fact that the Keurig K-Cups and or Keurig Single-Serve Brewers purchased by Plaintiff and the Class was deceptively marketed and sold at an uncompetitively high price. Thus, it would be

unjust and inequitable for Defendant to retain the benefit without restitution to the Plaintiff and the Class for the excessive price paid by Plaintiff and the Class.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, and on behalf of all other similarly situated persons, prays for judgment against Defendants as follows:

A.   For an order certifying this case as a class action and appointing Plaintiff and Plaintiff's counsel to represent the Class;

B.   For an order awarding, as appropriate, damages, restitution, or disgorgement to Plaintiff and the Class; and

C.   For an order awarding pre-judgment and post-judgment interest.

## VII.   JURY DEMAND

Plaintiff hereby demands a trial by jury of her claims.

Dated: August 21, 2015.                    Respectfully submitted,

                                           _____
                                           Thomas P. Thrash (ABA No. 80147)
                                           Marcus N. Bozeman (ABA No. 95287)
                                           **THRASH LAW FIRM, P.A.**
                                           1101 Garland Street
                                           Little Rock, AR 72201
                                           (501) 374-1058 - Telephone
                                           (501) 374-2222 - Facsimile

                                           Dewitt M. Lovelace
                                           **LOVELACE & ASSOCIATES, P.A.**
                                           12870 US Hwy 98 West, Suite 200
                                           Miramar Beach, FL 32550
                                           (850) 837-6020 – Telephone
                                           (850) 837-4093 – Facsimile

                                           *Attorneys for Plaintiff*

# UNITED STATES JUDICIAL PANEL
## on
## MULTIDISTRICT LITIGATION

**IN RE: KEURIG GREEN MOUNTAIN
SINGLE-SERVE COFFEE ANTITRUST LITIGATION**                MDL No. 2542

## TRANSFER ORDER

**Before the Panel:**[*] Pursuant to 28 U.S.C. § 1407, plaintiff in one Southern District of New York action moves to centralize this litigation in that district. The litigation consists of eight actions pending in the Eastern District of California, the District of Delaware, the District of Massachusetts, and the Southern District of New York, as listed on Schedule A. Since the filing of the motion, the Panel has been notified of seventeen related actions.[1] The actions in this litigation primarily involve allegations that Keurig Green Mountain, Inc., and its predecessors Green Mountain Coffee Roasters and Keurig Incorporated (the "Keurig Green Mountain companies" or "defendants") have engaged in anticompetitive conduct with respect to the Keurig single-serve brewer and single-serve coffee packs utilized in the Keurig brewer.

Movant proposes that the MDL should encompass three types of actions – direct purchaser class actions, indirect purchaser class actions, and individual actions brought by competitors of the Keurig Green Mountain companies. The responding parties support, or do not oppose, centralization of the direct and indirect purchaser actions – currently, six actions on the motion and seventeen potential tag-along actions[2] – but have divergent views on whether the competitor actions should be included. Defendants and the majority of responding plaintiffs in the Southern District of New York actions support centralization of all actions in that district, as proposed by movants, arguing that the same conduct by the Keurig Green Mountain companies is at issue in all actions. Plaintiffs in the two competitor actions – one in the Eastern District of California (*JBR, Inc.*) and one in the Southern District of New York (*TreeHouse Foods, Inc.*) – oppose centralization of their actions, arguing that certain aspects of their complaints allege unique harms to them as competitors, such as the alleged

---

[*]   Judge John G. Heyburn II took no part in the decision of this matter. Certain Panel members who could be members of the putative classes in this docket have renounced their participation in these classes and have participated in the decision.

[1]   These and any other related actions are potential tag-along actions. *See* Panel Rules 1.1(h), 7.1 and 7.2.

[2]   Plaintiffs in two potential tag-along actions on behalf of indirect purchasers (the Southern District of California *Schroeder* and *Gray* actions) filed briefs opposing centralization, but at oral argument, represented that they now support centralization.

Exhibit "C"

-2-

sham patent infringement actions against them by Keurig Incorporated. They also contend
centralization will unfairly delay their actions, which involve a pending motion for preliminary
injunction and expedited discovery requests that allegedly require resolution far in advance of issues
pertaining to the other actions. They suggest voluntary coordination as a practicable alternative to
centralization.

While we agree that these actions present some individualized factual issues, the existence of
such issues does not negate the common ones. All of the actions on Schedule A raise virtually
identical factual questions concerning the conduct of Keurig Green Mountain, Inc., and its
predecessors in allegedly monopolizing the market for single-serve coffee cups used in Keurig
brewing machines. Additionally, most of the complaints challenge defendant's alleged plans to
introduce a product redesign later this year, which is the subject of the motion for preliminary
injunction and other anticipated expedited proceedings in the *JBR* and *TreeHouse* competitor actions.
In any event, "Section 1407 does not require a complete identity or even a majority of common
factual issues as a prerequisite to centralization." *See In re: Park West Galleries, Inc., Litig.*, 887
F. Supp. 2d 1385, 1385 (J.P.M.L.2012).

Transfer under Section 1407 will offer the benefit of placing all related actions before a single
judge who can structure pretrial proceedings to accommodate all parties' discovery needs while
ensuring that common witnesses are not subjected to duplicative discovery demands. Section 1407
centralization thus will enable pretrial proceedings to be conducted in a manner that will lead to the
just and expeditious resolution of all related actions, which is to the overall benefit of all parties.
Additionally, we find centralization preferable to voluntary coordination given the number of involved
actions, counsel, and districts, and the complexity of the issues raised in this litigation.

With respect to actions that may involve case-specific or time-sensitive motions, it may be
advisable to establish a separate track of proceedings if those actions, as certain plaintiffs contend,
require expedited discovery or motions to protect the parties' rights, but the degree of consolidation
or coordination is a matter soundly dedicated to the discretion of the transferee judge. *See In re:
Hyundai and Kia Fuel Economy Litig.*, 923 F. Supp. 2d 1364, 1365 (J.P.M.L. 2013).

On the basis of the papers filed and the hearing session held, we find that the actions listed on
Schedule A involve common questions of fact, and that centralization will serve the convenience of
the parties and witnesses and promote the just and efficient conduct of this litigation. These actions
share common factual allegations concerning the conduct of the Keurig Green Mountain companies
in allegedly monopolizing the market for single-serve coffee packs or an alleged submarket thereof.
The defendants' alleged anticompetitive conduct includes, *inter alia*, acquisition of competitors,
entering into exclusionary agreements with suppliers and distributors to prevent competitors from
entering the market, engaging in sham patent infringement litigation, and a product redesign in the
next version of defendants' brewing system that allegedly will "lock-out" competitors' products.
Centralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings (particularly
with respect to class certification and preliminary injunctive relief); and conserve the resources of the
parties, their counsel and the judiciary.

-3-

We conclude that the Southern District of New York is an appropriate transferee district for this litigation. The majority of actions are pending in this district, which is conveniently located for this nationwide litigation. Defendant Keurig Green Mountain, Inc., has its principal place of business in Vermont, and thus common evidence will be reasonably accessible from this location. This district has the support of plaintiffs in four of the eight actions on the motion and four potential tag-along actions, defendants support it as their second choice of venue, and the opposing plaintiffs in one competitor action (*TreeHouse Foods*) support it in the alternative. Judge Vernon S. Broderick, who presides over sixteen of the pending actions against defendants, has extensive experience in complex civil litigation. We are confident he will steer this litigation on a prudent course.

IT IS THEREFORE ORDERED that pursuant to 28 U.S.C. § 1407, the actions listed on Schedule A and pending outside the Southern District of New York are transferred to the Southern District of New York and, with the consent of that court, assigned to the Honorable Vernon S. Broderick for coordinated or consolidated pretrial proceedings.

PANEL ON MULTIDISTRICT LITIGATION

Marjorie O. Rendell
Acting Chairman

Charles R. Breyer          Lewis A. Kaplan
Sarah S. Vance            Ellen Segal Huvelle
R. David Proctor

**IN RE: KEURIG GREEN MOUNTAIN
SINGLE-SERVE COFFEE ANTITRUST LITIGATION**          MDL No. 2542

## SCHEDULE A

Eastern District of California

JBR, INC. v. KEURIG GREEN MOUNTAIN, INC., C.A. No. 2:14-00677

District of Delaware

MAJOR v. KEURIG GREEN MOUNTAIN, INC., ET AL., C.A. No. 1:14-00348

District of Massachusetts

RIZZO v. KEURIG GREEN MOUNTAIN, INC., C.A. No. 1:14-11030

Southern District of New York

TREEHOUSE FOODS, INC., ET AL. v. GREEN MOUNTAIN COFFEE
    ROASTERS, INC., ET AL., C.A. No. 1:14-00905

HOYER v. GREEN MOUNTAIN COFFEE ROASTERS, INC., ET AL.,
    C.A. No. 1:14-01609

NEY SILVERMAN INSURANCE ASSOCIATES, LLC v. KEURIG GREEN
    MOUNTAIN, INC., ET AL., C.A. No. 1:14-01671

ROCKER v. GREEN MOUNTAIN KEURIG, INC., ET AL., C.A. No. 1:14-01716

CONSTANTINO v. KEURIG GREEN MOUNTAIN, INC., ET AL., C.A. No. 1:14-01836